UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| PASQUALE J. MARINO, ) | Case No. 6:07-bk-05112-KSJ |
| DEBORAH L. MARINO, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| | |
| MARGUERITE ULLIMAN, ) | |
| ) | |
| Plaintiff, ) | Adversary No. 6:08-ap-8 |
| vs. ) | |
| ) | |
| PASQUALE J. MARINO, JR., ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM OPINION

The plaintiff, Marguerite Ulliman, an older woman who divorced later in life, contends that the debtor, Pasquale J. Marino, Jr., defrauded her in connection with a real estate transfer and that the settlement they later reached is not dischargeable pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.[1] The debtor, representing himself, argues that he was just trying to help Ms. Ulliman, not harm her, and that the reason she lost her home was because she did not make the mortgage payments. For the reasons explained below, the Court finds that the debt owed to Ms. Ulliman is not dischargeable.

In late 2004, Ms. Ulliman lived in Palm Beach, Florida. She was approximately 68, was trained as a nurse, and was divorcing after a long-term marriage of 35 years. (The divorce was finalized in 2005.) Ms. Ulliman had never managed the family's finances and was not

---

[1] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

financially sophisticated. Knowing she needed to find a new place to live, she started looking for a condominium in the area.

During her search for a new home, Ms. Ulliman was introduced to the debtor, Pasquale Marino,[2] by a local realtor. He offered to help Ms. Ulliman buy a condominium using his expertise, access to credit, and the help of his current son-in-law,[3] Michael Verdon, who worked with a mortgage brokerage company, New Source Home Equity, Inc., to obtain the mortgage. To Ms. Ulliman, Mr. Marino held himself out as a "Real Estate Investor," who offered financing, and as an "Account Executive" with New Source Home Equity, Inc. He gave Ms. Ulliman business cards containing both of these representations. (Plaintiff's Exh. No. 4).

In reality, Mr. Marino had no experience in real estate investing. He was a painter and hung wallpaper. He and his wife owned their own houses, but they had never invested in other real property. Mr. Marino was never a real estate investor. He never held any position with New Source Home Equity, Inc. and had no ability to offer any "financing." He held himself out as an expert in real estate investing and financing, when, in reality, he had no such expertise. The representations made by Mr. Marino to Ms. Ulliman were false.

Mr. Marino testified that he did not give Ms. Ulliman the cards making these representations until after the parties already were engaged in their business together. The Court did not find this testimony credible. Moreover, even without the printed cards, Mr. Marino certainly made the same or even bolder promises regarding his expertise in inducing Ms. Ulliman to invest her monies with him.

---

[2] The co-debtor, Deborah L. Marino, was not involved in this transaction and has no liability to Ms. Ulliman. The dispute is only between Mr. Marino and Ms. Ulliman.

[3] In January 2005, Mr. Verdon was only dating Mr. Marino's daughter. They did not marry until after these events occurred. However, Mr. Verdon *was* associated with New Source Home Equity, Inc. at the time.

In January 2005, Mr. Marino purchased a condominium unit located in Palm Beach Gardens, Florida. (Plaintiff's Exh. Nos. 8 and 9). Title to the property was put in his name; however, at all times, Ms. Ulliman was the intended owner and paid all costs and expenses associated with the property and its purchase.

The closing occurred on January 28, 2005, at the height of the recent real estate marketing bubble. The parties, unfortunately, paid close to the high end of the market for the home. The purchase price was $247,000. On January 6, 2005, Ms. Ulliman had given Mr. Marino $54,783.87 to use toward the purchase. (Plaintiff's Exh. No. 7, Check No. 2953). Ms. Ulliman understood the monies would be used for closing costs and a down payment.

Although the debtor denies receipt, the Court would find that Mr. Verdon, the debtor's future son-in-law, sent an e-mail to the debtor, dated January 25, 2005, allocating the use of the $54,783.87 collected from Ms. Ulliman. (Plaintiff's Exh. No. 12). In the end, only $28,464.73[4] was used for the down payment and the closing costs. (Plaintiff's Exh. No. 9). Mr. Marino has not adequately accounted for the remaining balance of $26,319.14, although a portion of this amount, $6,000, was allocated to pay an "investor fee," which may have been paid to either the debtor or Mr. Verdon. (Plaintiff's Exh. No. 12).

Mr. Marino financed the balance of the purchase price through an adjustable rate mortgage in the amount of $234,650.00. (Plaintiff's Exh. No. 11). The interest rate initially was set at 9.850 percent and, under the terms of the related note, could not adjust until February 2007, at the earliest. The monthly mortgage payment was $2,033.26, and remained at this amount for all periods relevant to this dispute. Using Ms. Ulliman's monies, Mr. Marino made mortgage payments totaling $36,598.68. (Plaintiff's Exh. No. 10). (The parties paid $22,365.86

---

[4] The down payment amount was $12,500 and the closing costs were $15,964.73, yielding the $28,464.73 total.

in interest and principal in 2006, and $14,232.82 in interest and principal in 2005, for total mortgage payments of $36,598.68).[5]

Ms. Ulliman moved into the condominium in Palm Beach Gardens after February 1, 2005.  Prior to moving in, she signed a Residential Lease Agreement and Option to Purchase prepared by Mr. Marino. (Plaintiff's Exh. No. 1, Attachment E).   She was required to make monthly payments of $2,443, which was $410 higher than the actual mortgage payments of $2,033. (Plaintiff's Exh. No. 1, Attachment E, ¶ 5).  In addition, Ms. Ulliman was required to pay all costs associated with ownership of the condominium including real estate taxes, insurance costs, condominium assessments, and repair costs.  (Plaintiff's Exh. No. 1, Attachment E, ¶ 35). The option to "purchase" the condominium, at the increased price of $269,000, expired in December 2006. (Plaintiff's Exh. No. 1, Attachment E, ¶¶ 3 and 6a).

From January 2005 through September 2006, Ms. Ulliman gave Mr. Marino $129,534.08.[6] (Plaintiff's Exh. No. 7). The amount greatly exceeds the amount needed to purchase the property and pay the mortgage and property-related expenses.  Mr. Marino never provided any accounting for how he used these funds; however, after the fact, the Court can determine that Mr. Marino used the plaintiff's monies for the following expenses legitimately connected with the condominium:

---

[5] The plaintiff listed mortgage payments of $40,665.20. (Plaintiff's Exh. No. 12).  The debtor contends that he made mortgage payments of $46,964.98. (Debtor's Exh. No. G).  The only credible evidence of the amount of mortgage payments actually made is the amounts reflected in year-end statements for 2005 and 2006  provided by Ocwen Financial Corporation, the entity that serviced the mortgage encumbering the condominium.  It certainly is possible, and perhaps even likely, the mortgage payments were made after November 2006; however, no evidence demonstrates the amount of these payments.  Moreover, the differential between the established amount ($36,598.68),  the plaintiff's calculation ($40,665.20), and the debtor's calculation ($46,964.98), although constituting a $10,000 variance, is immaterial to the Court's ultimate ruling.

[6] Mr. Marino actually acknowledges that he received a larger amount, $134,247.34 (Debtor's Exh. No. G); however, the Court could not identify the source of the additional approximately $5,000.

|  |  |
|---|---:|
| Down Payment | $12,500.00 |
| Appraisal | 300.00 |
| Purchase Closing Costs | 15,964.73 |
| Mortgage Payments | 36,598.68 |
| Homeowner's Assoc. Fees | 6,962.40 |
| Insurance | 1,484.00 |
| Real Estate Taxes | 3,217.14 |
| TOTAL | $77,026.95 |

Therefore, Mr. Marino received at least $52,507.13 ($129,534.08 - $77,026.95 = $52,507.13) from Ms. Ulliman that he did not use to pay expenses related to the condominium.

Mr. Marino contends that $30,000 of this amount is attributable to two "gifts" that Ms. Ulliman gave him. She paid him $10,000 on October 2, 2005, and $20,000 on February 27, 2006. (Plaintiff's Ex. No.7, Check Nos. 3147 and 3257). Mr. Marino testified that Ms. Ulliman gave him this $30,000 because she felt bad that she had not gotten a replacement mortgage to substitute for the one obtained by the debtor. This makes absolutely no sense. How could Ms. Ulliman have paid a second down payment or obtained a replacement mortgage when she already had given Mr. Marino all of her monies? Rather, perhaps Mr. Marino had falsely promised the plaintiff that, if she let him use her money for a short period of time, he would buy the condo, put it on the market, and then sell or "flip" it for a profit.[7] Of course, the housing bubble burst, the market for residential homes collapsed, and no sale occurred. The mortgage company eventually foreclosed upon the condominium.

By April 2006, Ms. Ulliman had experienced serious family traumas including the deaths of two of her sons and a sister. In July 2007, she moved to Indiana to live in a home owned by a son. At age 71, she has returned to work as a registered nurse to earn sufficient income to pay

---

[7] The debtor certainly assumed that Mr. Marino would sell the condo because she asked him, in a note accompanying her check, dated November 16, 2005, whether she would incur capital gains taxes because she had not lived in the condo for at least two years. (Plaintiff's Exh. No. 7).

her expenses. She has no remaining retirement savings. She never obtained title to the condo, yet she funded every dollar attributable to its purchase and all related expenses.

Mr. Marino never paid a single penny of the condo's cost. He has not articulated any justification for a gift of $30,000 from the plaintiff. Indeed, in a later agreement, in February 2006, he characterized the $30,000 as "his investment interest." (Plaintiff's Exh. No. 12). Moreover, he never accounted for or even attempted to explain what happened to the other $22,000, other than to suggest the monies were used to pay unproven mortgage payments. The Court concludes that the debtor received at least $40,000 from Ms. Ulliman over and above the amount needed to purchase and pay expenses for the condominium without any credible justification or explanation.

Eventually, Ms. Ulliman filed a complaint in state court[8] asserting seven counts against Mr. Marino: (1) Civil Action for Exploitation of the Elderly, (2) Violation of Chapter 494 of the Florida Statutes, asserting Mr. Marino improperly acted as a mortgage broker, when he held no licenses, (3) Fraud, asserting that Mr. Marino defrauded her by acting as a mortgage broker and receiving large fees for his services, when he was not a licensed broker, and by falsely inflating the monthly mortgage charges associated with the property to further defraud Ms. Ulliman, (4) Conversion, (5) Civil Theft, (6) Accounting, and (7) Constructive Trust. (Plaintiff's Exh. No. 1). The debtor, who was represented by attorneys in the state court action, contested the allegations in the Amended Complaint asserting, in summary, that Ms. Ulliman was responsible for the loss of her home because she failed to get adequate financing to purchase the property from the debtor. (Plaintiff's Exh. No. 2). A trial was set for August 10, 2007. (Plaintiff's Exh. No. 3).

---

[8] The case is styled as <u>Marguerite A. Ulliman vs. Pasquale Joseph Marino, Jr.</u>, Case No. 502006CA012932XXXXMBAD, filed in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. (Plaintiff's Exh. No. 1).

Rather than go to trial, the parties reached a settlement on May 18, 2007. (Plaintiff's Exh. No. 5). The debtor paid Ms. Ulliman $10,000 immediately and then was to pay approximately $50,000 over time. (Plaintiff's Exh. No. 6). The debtor breached these future payment obligations. The settlement agreement contemplated that, upon such breach, the debtor would owe Ms. Ulliman an additional $65,000.

The debtor made no further payments on the settlement with Ms. Ulliman before filing this Chapter 7 bankruptcy case on October 19, 2007. Shortly thereafter, Ms. Ulliman filed this adversary proceeding, asserting that the amount still due under the state court settlement agreement, $65,000 plus interest and costs, is not dischargeable under Section 523(a)(2)(A).

The primary purpose of bankruptcy law is to provide an honest debtor with a fresh start by relieving the burden of indebtedness. Perez v. Campbell, 402 U.S. 637 (1971); In re Price, 48 B.R. 211, 213 (Bankr. S.D. Fla. 1985); Matter of Holwerda, 29 B.R. 486, 489 (Bankr. M.D. Fla. 1983). The burden of proof in all actions under Section 523 of the Bankruptcy Code is upon the plaintiff/creditor to show by a preponderance of the evidence that the debt is not dischargeable. Grogan v. Garner, 498 U.S. 279, 287 (1991); In re Chalik, 748 F.2d 616 (11th Cir. 1984). Exceptions to the dischargeability of a debt are to be construed strictly in favor of the debtor. Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (1986); Kiester v. Handy (In re Handy) 164 B.R. 355 (Bankr. M.D.Fla. 1994).

Pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, a debtor cannot discharge a debt to the extent the debt is for money obtained by false pretenses, a false representation, or actual fraud. In order for a debt to be nondischargeable under this section, a plaintiff must prove the following five elements:

1. The debtor made a false representation with the purpose and intent of deceiving the creditor;

2. The defendant/debtor knew the representations were false at the time they were made;

   3. The creditor relied upon such representations;

   4. The creditor's reliance was justified; and

   5. The creditor sustained a loss as a result of such representation.

SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998); Hunter, 780 F.2d at 1579; Manufacturer's Hanover Trust Company v. Abercrombie (In re Abercrombie), 148 B.R. 964, 965-966 (Bankr. M.D.Fla.1992). To prove the necessary fraud under Florida law, creditors/plaintiffs must establish that the debtor/defendant made a "deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff." St. Laurent II v. Ambrose (In re St. Laurent II), 991 F.2d 672, 676 (11th Cir. 1993) (quoting First Interstate Development Corporation v. Ablenedo, 511 So.2d 536, 539 (Fla. 1987)).

In this case, the Court first must decide whether Bankruptcy Code Section 523(a)(2)(A) excepts from discharge the debt embodied in the settlement agreement entered into between the debtor and Ms. Ulliman. In other words, whether the amount Mr. Marino owes Ms. Ulliman under the agreement settling her state court claims against him constitutes a debt for money obtained by false pretenses, a false representation, or actual fraud, or whether the nature of the debt somehow changed by virtue of the settlement. The United States Supreme Court visited this very question in Archer v. Warner, 538 U.S. 314 (2003).

In Archer, the Warners purchased a manufacturing company for $250,000 and sold it six months later to the Archers for an inflated price of $610,000. The Archers sued the Warners in state court for fraud in connection with the sale. The parties eventually settled the lawsuit for a $200,000 payment plus a promissory note to pay $100,000 more. The Archers executed broad releases discharging the Warners from "any and every right, claim, or demand" that the Archers had or could later have against them with the exception of the Warners' obligations under the promissory note. Archer, 538 U.S. at 317. Thus, other than their obligation to pay the $100,000 under the promissory note, the Warners were completely released from the Archers' claims.

The Warners failed to make the first payment due under the promissory note; the Archers sued for the payment in state court; the Warners then filed for bankruptcy. When the dispute reached the Supreme Court of the United States, the issue before the Supreme Court was whether the language in Bankruptcy Code Section 523(a)(2)(A) excepted the settled debt from discharge. The Supreme Court held that the settlement did *not* prevent the Archers from asserting the debt was not dischargeable because it was incurred through fraudulent conduct, citing its earlier decision, Brown v. Felsen, 442 U.S. 127 (1979), holding that bankruptcy courts could, and properly should, examine the details behind a stipulation/settlement agreement "to determine whether it reflected settlement of a valid claim for fraud." Archer, 538 U.S. at 320.[9]

In Brown, the Supreme Court reasoned that Congress intended the fullest possible inquiry into the nature of a debt to ensure that all debts arising out of fraud are excepted from discharge regardless of their form. Archer, 538 U.S. at 320 (citing Brown, 442 U.S. at 138). Further, Congress "intended to allow the relevant determination (whether a debt arises out of fraud) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns 'are not directly in issue and neither party has a full incentive to litigate them.'" Archer, 538 U.S. at 321 (quoting Brown, 442 U.S. at 134). The Supreme Court specifically found that a "debt embodied in the settlement of a fraud case 'arises' no less 'out of' the underlying fraud than a debt embodied in a stipulation and consent decree." Archer, 538 U.S. at 321. "In other words, creditors are free to look beyond a settlement to determine the character of the debt." In re Burrell-Richardson, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006) (noting that Brown and Archer have been widely applied by bankruptcy courts in examining the underlying nature of a debt regardless of its form, and listing cases as examples); In re Schwartz, 2007 WL 3051865, 3 (Bankr.S.D.Tex.2007) ("In § 523 proceedings, the relevant inquiry focuses on the

---

[9] In Archer, the debt at issue was in the form of money promised in a settlement agreement, while in Brown, the debt was in the form of a stipulation and consent judgment.

conduct from which the debt originally arose. Liable parties can not erase the history of a debt's origin through a settlement and subsequent breaches of the settlement.")

Applying the rule of Archer and Brown and looking at the substance of the transaction underlying the settlement agreement in this case, this Court next must determine whether the settled debt is excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A). The elements of Section 523(a)(2)(A) require the plaintiff to demonstrate that Mr. Marino made a knowingly, false representation upon which Ms. Ulliman justifiably relied to her detriment.

As discussed above, the debtor knowingly and falsely represented himself as a sophisticated real estate investor and as an account executive at New Source Home Equity, Inc. Regardless of whether the representations were oral or written, Mr. Marino held himself out to Ms. Ulliman as an expert in buying houses and getting financing. He convinced her she could buy a condominium, live in it for a time, and then sell it for a huge profit in the then existing volatile housing market. At the time Mr. Marino made these representations, he had no such expertise or knowledge.

The debtor made the representations with the intent of deceiving Ms. Ulliman, hoping to make a profit for himself. (Plaintiff's Exh. No. 4). Ms. Ulliman relied on Mr. Marino's representations as to his credentials, believing he could assist her in a financial transaction about which she herself had little to no understanding or expertise. Mr. Marino took advantage of her reliance, directly causing Ms. Ulliman to lose at least $40,000 in addition to her substantial loss of the condominium.

The last issue is whether Ms. Ulliman's reliance on Mr. Marino's representations was justified. The concept of justifiable reliance was explained by the bankruptcy court for the Northern District of Alabama in In re Meyer, 296 B.R. 849, 861 -862 (Bankr.N.D.Ala.2003):

> Typically, justifiable reliance permits a plaintiff to rely unequivocally on a representation or promise made by a debtor, without investigating or acting reasonably to determine the truth of the representation or promise, unless the statement is patently false. In other words, the creditor's reliance will likely be justified if there is nothing on the face of the representation that would lead the creditor to believe that the representation is false, or if the creditor does not have actual knowledge from which he should realize the representation is false at the time it is made.
>
> . . .
>
> In determining whether reliance is justified, the attributes of the particular creditor must be taken into account. What is considered a justifiable reliance for one creditor could be completely unjustified as to another creditor in a similar situation.

Meyer, 296 B.R. at 861-62 (internal quotations and citation omitted). Justifiability is not without limits, however, and a plaintiff always must use his or her own common sense. Meyer, 296 B.R. at 862 (citing Field v. Mans, 516 U.S. 59, 71 (1995)).

Here, Ms. Ulliman was not financially sophisticated, was divorcing after a 35-year marriage, and had never managed her families' finances. She was introduced to Mr. Marino by a credible source, her realtor, and Mr. Marino had a personal connection with a mortgage brokerage company through his (now) son-in-law. By all appearances, Ms. Ulliman concluded that Mr. Marino was a sophisticated real estate investor with access to financing. He appeared as knowledgeable and well-connected in the business. Ms. Ulliman's reliance on Mr. Marino's professed expertise was justified.

Accordingly, the Court ultimately finds that Ms. Ulliman has established by a preponderance of the evidence that the debtor knowingly and deliberately made a misrepresentation upon which she justifiably relied to her detriment. Mr. Marino's debt to Ms.

Ulliman pursuant to the settlement agreement is excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A). A separate judgment in favor of Ms. Ulliman and against the debtor consistent with this Memorandum Opinion shall be entered.

    DONE AND ORDERED in Orlando, Florida, on January 28, 2009.

                                         KAREN S. JENNEMANN
                                         United States Bankruptcy Judge

Copies provided to:

Plaintiff's Attorney: John L. Bryan, Jr., Scott Harris Bryan Barra & Jorgensen, PA, 4400 PGA Blvd., Suite 800, Palm Beach Gardens, FL 33410

Pro Se Defendant: Pasquale J. Marino, Jr., 5562 Whispering Woods Point, Sanford, FL 32771